Ruffin, C. J.
 

 The bill raises two points of equity. They arc combined in some confusion in the bill; but, as they are in their nature entirely distinct, they ought to be disposed of, each by itself. The first is, that the deed by mistake of the writer, or the contrivance of the purchaser, was drawn so as to cover more land than was agreed to be conveyed, and the plaintiff executed it without a knowledge of the error, and fully believig covered only the tract of 183 acres. But, the plaintiff says that he ought, at all evei^í lieved against the deed, upon the ground,
 
 thal
 
 him to have known the contents, and to havef/cxccuted : willingly at the time, it is one of those couti^ the policy of the law forbids, because it w^s^xuidulv, obtained from an inexperienced young man, justSif age, by one standing
 
 in loco parentis,
 
 and acting as his guardian and agent about this property. The natural XT»
 
 *360
 
 order of treating the subject is to ascertain, first, what really was the contract, before we consider whether it be obligatory in law or not. There is, in the first place, a presumption that the dealings are fair, and that the deed conforms to the agreement of the parties, unless the contrary is made to appear by satisfactory proof, direct or circumstantial The allegation in the bill is, that the defendant agreed to take the land then recovered, which was 102 acres, and the sum of $250 decreed for the profits, and pay the purchase money to McCulloch, give up any demand for previous expenditures in the various suits, and, at his own expense, prosecute a suit for the other tract of 120 acres and the profits, in the name of the plaintiff and Willis, and for their benefit. Now, this is positively denied in the answer ; and the defendant avers, that his expenses and the payment to McCulloch amounted to more than the full value of the land and the profits, and that, although he claimed the land by contract with bis brother, yet he offered the other parties their choice, either to reimburse to him his expenses and take the land to themselves, subject to
 
 the debt
 
 to McCulloch and the contest as to part with Hugh Cunningham’s heirs, or let him have their claim. The defendant says, that, without hesitation, they preferred 'the latter, and that the deed, as drawn, was but in completion of the agreement. :
 

 Against those statements in the answer, thus responsive and directly contradictory to the bill, the plaintiff cannot have a declaration of facts , in his favor, unless upon very clear proof, that the contract, as made, wras different from these representations of the answer, and that the contents of the deed were concealed from, or, at the least, unknown to the plaintiff, when he executed it. Generally, when a person makes a deed, who is able to read it, the presumption is, that lie did read it, and, if he did not, it is an instance of such consummate folly to act upon so blind a confidence in a bargain, when each party
 
 *361
 
 is supposed to take care of himself, that it would be dangerous to relieve upon the mere ground of a party’s negligence to inform himself, as he so easily might, of what he was doing. Therefore, commonly, tho Court ought not to act on the mere ignorance of the contents of the deed ; but there should be evidence of a contrivance in the opposite party to have the instrument drawn wrong and to keep tho maker in the dark. In this case, however, it may be yielded, that from the confidence arising out of their near blood relationship and from the apparent candor, with which his uncle had eommnicated the information of his rights, .and the fairness with which he seemed to deal with his nephews, that the plaintiff might have executed the deed, prepared under his uncle’s directions, without being so culpable for not reading it or having it read, as to preclude him from being relieved against so much of it as may not accord with the bargain as made. Then, we are to enquire what is the evidence opposed to or in support of the representations of the answer. There are but two witnesses who professed to have been present at the making of the contract. The one is Elisha Willis, a party to it, and the other is the defendant’s son, John, who now claims part of the
 
 land;
 
 both of whose depositions have been taken and read without objection. The account of each is very barren of details: so much so, as to lead to some suspicion, that they might be afraid to trust themselves to entering on them, or do moi'e than depose to what they thought the main fact, lest they might be exposed to contradiction. Willis, however, says, that Nicholas Michael agreed to give #1,300 for the tract of. 162 acres then recovered, and that the deed executed in Fisher’s office was, “as he understood it,” for that tract, but that it was not read. Ho says also, that the debt due to McCulloch then was #1,600. On the other hand, John Michael says, that the plaintiff and Willis, after hearing from his father the circumstances of the case, came to an arrangement with him to pay McCulloch and
 
 *362
 
 “take the land,” without positively specifying what land, whether the whole tract purchased from McCulloch, or the part recovered from Allen, though the former must he supposed to have been meant. Upon these two statements. by themselves, no one could say he had a clear belief as to the actual agreement; and therefore, upon them it would be impossible to declare, that the deed' 'was different from the agreement. For, in such a case, in order to determine which of the two witnesses is entitled to the more confidence in his memory and integrity, one naturally enquires whether the executory contract was about the lime executed by making a deed > and, if it was, one looks at once at the deed, as the best evidence which is right. Instead of such evidence controlling the deed, that instrument is decisive between the witnesses. But here, it is said, the deed was not read, and the execution of it, when the party was ignorant of its contents, Takes away.all its force, as evidence of the terms of the original contract, and that it is not pretended in the ease, that those terms were intended to be varied by any second contract. That brings-us down to an enquiry into that single question of fact, whether the deed was read or not. The bill says it was not.. -The answer is positive, that it was. Willis supports the bill, and John Michael as directly supports the answer. -If the matter rested there, the decree must ber for the defendant, without taking any notice of the circumstances under which Willis gave his deposition
 
 ;
 
 for the
 
 onus
 
 is on the plaintiff, not only to produce a preponderance of proof, but a plain preponderance, leaving no doubt in the mind as to the fact of the case. But the' evidence docs not stop there, for, besides the presumption; that the contenís of the deed were known to the parties-before they, would execute it, there are the testimony of Mr. Fisher, and the circumstances under which the deed was prepared, and also the probability, as will be presently pointed out, that, the bargain would have been
 
 *363
 
 as the defendant says it was. There is nothing to induce a suspicion that the instructions to Mr. Fisher, respecting the land to be described and conveyed in the deed, were not given by both of the parties, or, at all events, by Nicholas Michael in the presence of the others. The bargain was made in the country on one day, and the parties all went together the next day to the office of the Clerk and Master, where the boundaries of the land could be ascertained, to have the deed drawn. Willi's does not suggest, nor is John Michael or Mr. Fisher examined to show, that Nicholas Michael alone gave the instructions or had any private interview with Mr. Fisher, and, without particular instructions from some one, that gentleman could not have known at all, how the deed was to be drawn. The open manner then, in which the instructions'must have been given, and the perfect indifference of tbe writer between the parties,-and the capacity of the plaintiff to read tbe deed, and the impossibility of knowing before band that he would not read it or have it read, all go to show, that there was no intentional departure from the instructions, and also the extreme probability that tbe instructions were agreeable to the bargain. It is to be remembered, that there is no pretence that the deed >vas read falsely. The allegation is, that it was not read at all, as an excuse for executing it, notwithstanding its variance from the agreement. Now, how should it happen, that Mr. Fisher should write the deed variant from the bargain ? What motive had he to do so ? How could he have made such a mistake ? But Mr. Fisher says, that he is confident, that either the plaintiff read the deed or that he read it to all the parties. Not that he remembers it absolutely, though he has some recollection of the transaction. But he knows- certainly from his habits, as'a man of business, that he would not have attested the instrument as a subscribing witness, unless tbe contents had been known to the parties. Here, then, is direet'proof of a very satisfactory kind, supported
 
 *364
 
 too, by the circumstances, under which the deed must have been drawn, to establish, that the plaintiff knew the contents of the deed, and by consequence, that the contents were according to the intention of the parties. But the 'plaintiff meets this argument by the observation, that it is only an inference from Mr. Fisher’s testimony, that the plaintiff knew the deed covered more than the 162 acres, and that such inference is met and repelled by the opposite inferences, to be deduced from the facts, that the sums paid and to bo paid by the' purchaser were much less,'than the value of the.whole tract; that he did not register his deed, but kept the contents concealed ; and that afterwards the defendant instituted a suit for the 120 acres, in the name of the plaintiff and his sister, and put up no claim to it for himself, but declared he was prosecuting it as agent for their benefit.
 

 As to the relative amount of tho value and the price, the inference is clearly tho other way, even upon Willis’ testimony. The plaintiff does not examine a witness, as to the value of the land, except one, who says, that, if the land was as he knew it thirty-five years before this suit . — meaning, we suppose when nearly all uncleared and with its virgin soil — it would now be worth $8 per acre. But other witnesses prove the actual value of one half to be $5, and of the other half $4 an acre, making an average of $4 50. Now, Willis says, that the debt to McCulloch was
 
 $1,600,
 
 as he understood, 'and this was to be paid off by Nicholas Michael, out of the price of the laityl, which was sold to him — which, he understood, was the 152 acres, taken at $1,300. In the first place, it is to be noted, that he does not say one word about what was to become of the remaining 120 acres, or that any suit w^s to be brought for it by Nicholas Michael for his benefit and the plaintiff’s. That statement is found in the bill, but not in the deposition of the witness, and is denied •in the answer. But it is clear, that the witness must also be mistaken, as to (he price of the parcel of land pur
 
 *365
 
 chased by the defendant. For, to make the 162 acres bring $1,300. it mast be valued at upwards of $8 per acre; and, if that was all the purchaser was to have, in ■ eluding even the $250 then in the office for profits, there would still remain unpaid $50 of the debt to McCulloch, and Nicholas Michael be out of pocket all his expenses, besides the loss of time and trouble. If to that be added (as must be according to the allegation of the bill) the expense and further loss of time and trouble of carrying on the projected controversy with the Cunninghams, it would appear to have been one of the most disadvantageous bargains, that a silly old m an ever made. One cannot readily contradict a tale, if there were precise evidence to the several circumstances supposed. But when the computation is made, upon the basis of the true value of the land, it is seen, that it would be utterly impossible it could be true, if Nicholas Michael had any sense at all. The 162 acres, at the actual value, $4 50 an acre, came only to $720, and the profits of $250 added, only made $079 ; and it is pretended, that for that land and money the purchaser was to pay McCulloch upon the spot $1600, and pay himself for all his outlays. Even if the other 120 acres be added at $4 50, making $540, and an aggregate of $1510, there would be left $81 due to McCulloch, and all that the uncle had, himself, been out of pocket; which the parties might expect to be covered by the profits to be recovered from Cunningham, but which was not thus covered; for, at the end of fourteen years more, only the sum of $700 was received therefor. But. computing the debt to McCulloch at $1900, as the defendant swears it was, and as is rendered probable by that sum being inserted i,n the deed as the consideration, the badness of the bargain is so palpable, that, on the part of the purchaser, we can only account for his making it by the attachment to the property, which might have arisen from his long contests for it, and the final triumph as to the most important portion of it. Tima
 
 *366
 
 we should suppose, if the transaction had been considered by the parties as really a purchase, upon a new contract then made. But upon the footing upon which the answer puts it, we readily understand why the business should hávé taken that course. The answer says, that the defendant and his brother had, thirty years before, understood each other, that the defendant was to pay for the land and have it; and therefore, that he had been contending all along for himself, though in the names of his brother’s children, and hence he felt bound to treat the land as his own, and, of course, to bear the whole burden.
 

 The deed is, therefore, not impeached by the least probability from the price, that the purchase was of less land than was conveyed, but, on the contrary, the circumstances most strongly sustain it in that point of view. Then, as to the circumstances, that the defendant did not register the deed until 1831, and called himself “ agent,” and said he had been employed to sue for the land for those parties : they furnish, at best, but feeble and inconclusivé arguments, in opposition to the other circumstances and to the allegation of the bill, that the contents of the deed were not known to the plaintiff. But the answer gives a reasonable explanation, why the deed was not registered sooner, which removes the inference from that; and to the other part of the argument, it is plain, as the answer states, that the defendant would naturally hold himself out as agent, when suing in the names of the others, though to his own use. But whatever weight there might be in those circumstances and in the testimony of Willis, the whole is completely overthrown by the deductions' necessarily to be made from a few other undisputed and indispensable facts. One is the fact, that, pending'the suit with Cunningham, Willis entered into a part of the land under Cunningham and as his tenant. Now, if it had been understood', that Nicholas Michael was suing for the benefit of Willis and
 
 *367
 
 his wife, would he have attempted to defeat his own bill by becoming the tenant of his adversary ? Undoubtedly not. The other is, that the suit against Cunningham pended fourteen years, and, during the whole time and. for three years afterwards — until this bill was filed — the plaintiff did not look after it at all, made no enquiries as to its progress or result, and had, indeed, no communieation whatever with the defendant, or with the solicitor or counsel in the cause, except that he once expressed his indignation that Willis should pretend any right to the land, or go in under the opposite title. If the suit had been for his benefit — as he says he understood it — it cannot be believed, that he should have been so totally regardless of his own interest, as not to have opened his mouth about it, for upwards of seventeen years. On the opposite supposition, that he had agreed, that his uncle should take the whole of the land, and that he had conveyed his claim to him, and that the uncle was carrying on the suit for his own benefit, every thing is consistent.
 

 The Court has no doubt, therefore, that the plaintiff well knew, when he executed the deed to his uncle, that it included the whole of the land, which had been purchased from McCulloch: as well that then in the possession of Hugh Cunningham’s heirs, as that which had been recovered from Allen. And we are well satisfied, that this pretence would never have been set up, if the plaintiff had not hoped, that he might have had some ground of relief in the doctrine of the Court of Equity which forbids undue advantages being made in contracts between persons standing in confidential relations.
 

 There is no doubt about the rule of the Court. If a guardian, agent, or other person standing in a confidential relation, avail himself of information, which his situation puts him in possession of, or of the influence, which is the natural consequence of habitual authority or confidence, to gain an undue advantage by getting obligations.or com
 
 *368
 
 veyances without adequate consideration, they cannot stand. The Court regards such transactions as extremely dangerous, and sets them aside, except as securities for what may have been done under them. Even if that were done here, the plaintiff, it would seem, would not profit by it, as it is fully clear, the land cost the defendant the value to the last farthing. But the difficulty is, to make the principle of equity roach this case, by finding such a confidential relation between the parties as comes within the sense of the rule, or, if there was, that any undue advantage was taken of the defendant. It may, however, be remarked, in the first place, that the plaintiff’s witnesses, Willis and wife, completely disprove the statements of the bill, as to the pretended professions of paternal regard on the part of the uncle, and the compliance with the demands on the part of the plaintiff being the effect of confidence or induced by personal influence: They make out a case, in which the defendant insisted upon his rights, and threatened to enforce them against the properties and bodies of the-plaintiffs, and his witnesses. But, passing by that contradiction, we will come to the other point. There was no guardianship in fact of the plaintiff by his uncle, nor any agency7 constituted by the contract. The whole matter is, that the uncle had been suing for the land for his own benefit, in the names of the infant heirs of a former equitable owner. Whether his claim of a purchase or donation from a former owner was well or ill founded, makes no difference to this purpose. He represented a case to the plaintiff, in which, if true, he had really been suing for himseli and not for the plaintiff, though he had been proceeding in the plaintiff’s name. Now, he candidly told the plaintiff, that he could not establish the contract with the plaintiff’s father; and therefore it was at the plaintiff’s option to claim the land and take it under certain known incumbrances, or let the defendant have it as his own,, under those encumbrances, according to the alleged understanding writh the plain
 
 *369
 
 tiff’s father. The latter arrangement the plaintiff preferred, and very properly, if he had any faith in the assurance of his uncle, because he was but fulfilling the engagement of his father, under which his uncle had incurred much expense, and had vast trouble. Thus viewed, the transaction was not a sale of the plaintiff’s property. Neither party so regarded it, for not a cent was offered by the one or received by the other. It was a mer.e surrender of a legal title, and, as it were, to the equitable owner, of the land — a title which au honest man could not have withheld. The bill puts the case upon the assumption by the defendant of the title of next friend of the plaintiff, in the bill filed in his name, and calling himself agent in conducting the business. But that is a poor quibble ; for .those titles the defendant was obliged to assume, because he had to sue in the plaintiff’s name, and he was at the time an infant. The question is, for whose benefit he was suing. Was he really endeavoring to recover the land, as land equitably belonging to the plaintiff or himself. Upon the record, he said, necessarily, that it was the plaintiff’s ; but every body understood, as Mr. Fisher states, that the defendant was the sole manager, and conducted the case as if it was his own. If the defendant had meant anything unfair, and his object had been to make a profitable bargain out of his nephew, he would have made his proposals before the suit was decided, when he might have expected au advantage. But, instead of that, he waited until the decision, and then made a' representation to the plaintiff and his sister, which does not appear to have been in any respect unfounded, except in a mistake as to her being an heir; and, under the influence of the representation, they agreed to convey their formal title, and the plaintiff has acquiesced in that arrangement seventeen years without a murmur — while the defendant was prosecuting a doubtful litigation at great expense for nearly half of the property. It is as clear,
 
 *370
 
 that the defendant prosecuted the first suit upon a claim, of his own to the land, as that he did the second, though his title in the first instance was not established by such apparent proof as it was in the second, when he had obtained a deed from the plaintiff for the whole of the land. It is a total perversion of the rule of equity, to apply it to such a case. There had in fact been no confidential relation between the parties, nor any previous communications even; and there was no purchase, as of the plaintiff’s right in the land. lie simply gave up a nominal claim to it, as ail the parties understood. Besides, if it bad been a sale, it would have been one, as-we have already seen in considering the other point, in which the land stood tbe defendant in the fullest value.
 

 Upon the whole, therefore, the Court deems the suit to be entirely groundless, and dismisses the bill with costs.
 

 Per Curiam.
 

 Bill dismissed with costs. '